## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

LUCAS NICOLSON,           )
                               )
          Petitioner,     )
                               )
v.                            )     Docket No. 09-cv-541-P-S
                               )
ERICA PAPPALARDO,     )
                               )
          Respondent.   )
                               )

## FINDINGS OF FACT & CONCLUSIONS OF LAW

Before the Court is Petitioner Lucas Nicolson's Petition for Return of Child (Docket # 1), which invokes his rights under the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), opened for signature Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 et seq.

At a hearing on the Court's November 6, 2009 Order to Show Cause, the Court set this matter for an evidentiary hearing, which was held on December 23, 2009. Based on the record now before the Court, the Court GRANTS the Petition for Return (Docket # 1). In connection with this ruling, the Court makes the following findings of fact and conclusions of law:

## I.     FINDINGS OF FACT

### A.     The Parties

1.     Petitioner Lucas Nicolson is a citizen of Australia.  He is employed by the Australian Defense Force and is under contract to serve in Townsville, Australia through May 2012.  He is the father of S.G.N.

2.     Respondent Erika Pappalardo is a citizen of the United States and resides in South Portland, Maine.  She is the mother of S.G.N.

3.     S.G.N. is the one year old daughter of Nicolson and Pappalardo.  S.G.N. was born on December 22, 2008 in Townsville, Australia and holds a United States passport.

### B.     The Parties' Relationship and S.G.N.'s Removal from Australia

1.     After initially meeting at a bar in Austria, Nicolson and Pappalardo began a relationship while she was travelling in Australia in early 2008.  She quickly moved in with him in his residence in Australia.  While they were living together in Australia, Pappalardo became pregnant with S.G.N.

2.     Pappalardo returned to the United States.  Nicolson proposed to her over the phone and she accepted.  She returned to Australia to marry Nicolson and make Australia her home.

3.     Nicolson and Pappalardo were married in Australia in August 2008.  They lived together as a married couple in Townsville, Australia from the time of their marriage until March 29, 2009.  S.G.N. resided in the parents' marital home from the time of her birth until March 29, 2009.

2

4.      The parties' marriage was fraught with difficulties from the beginning. There were numerous conversations about the viability of the marriage, both before and after S.G.N. was born.  However, for the most part, they lived as married couple and shared responsibilities for S.G.N.  Although Nicolson was working long hours and sometimes away on training exercises for weeks at a time, he was an active father who was consistently concerned with the welfare of his child.

5.      In March 2009, while still living in the marital home, Pappalardo wrote Nicolson a letter expressing her desire to return to the United States. Pappalardo asked Nicolson to sign the paperwork necessary to obtain a United States passport for S.G.N.  In response, Nicolson asked Pappalardo to give the relationship another chance, and to commit to staying in Australia for three months.  Pappalardo agreed to work on the relationship and in return Nicolson signed the papers for S.G.N. to obtain a United States passport so that Pappalardo and S.G.N. could travel to the United States to visit her family.  Nicolson did not expect that Pappalardo would use the passport to travel to the United States with S.G.N. permanently.

6.      About a week later, Pappalardo asked her mother to come to Australia to help her travel back to the United States with S.G.N.  Pappalardo's mother purchased a round-trip ticket for herself and a one-way ticket for Pappalardo and S.G.N.

7.      Pappalardo shipped some personal belongings to the United States.  She gave Nicolson the title to her car and they agreed that he should attempt to

3

sell it.  Pappalardo packed up the remainder of her belongings and flew with her mother to Sydney.

8. On March 29, 2009, Nicolson drove Pappalardo and S.G.N. to the Townsville airport.  The parties had a tearful parting and Pappalardo and S.G.N. flew from Townsville to Sydney, Australia.  Nicolson expected that Pappalardo and S.G.N. would be gone from Australia for a few months.

9. On March 30, 2009, Pappalardo met up with Nicolson's sister and mother in Sydney.  She admitted to them that she did not intend to return to Australia.

10. Nicolson's mother then contacted him and expressed her concern that Pappalardo was not planning to return to Australia with S.G.N.  Upset that it appeared Pappalardo was reneging on her promise to return to Australia, Nicolson immediately arranged to take leave from work, purchased a plane ticket, and flew to Sydney.

11. Upon arrival in Sydney, Nicolson went to Pappalardo's hotel.  Nicolson was angry that Pappalardo had indicated that she may not return to Australia and they discussed the issue.  The status of their relationship at this point was unclear.  Pappalardo was unsure whether she would ever return to Australia.

12. The same evening, Nicolson consulted an attorney about his options with regard to Pappalardo taking S.G.N. to the United States.  Although the attorney told Nicolson that he could take steps to prevent S.G.N.'s

4

removal, Nicolson decided to attempt to work out his relationship with Pappalardo rather than institute legal proceedings.

13. On April 1, 2009, Nicolson spent the day with Pappalardo and S.G.N. in Sydney. Pappalardo conveyed to Nicolson that she was still planning to leave Australia but that she would be open to continuing to work on their relationship.

14. On May 2, 2009, Pappalardo, her mother, and S.G.N. flew from Sydney, Australia to the United States.

**C.    Events Post-Removal**

1. Pappalardo and Nicolson were in regular contact after she returned to the United States.   They communicated almost daily via phone calls, text messages, and Skype.

2. Pappalardo put an airline ticket back to Australia departing May 22, 2009 on hold with STA Travel in Boston.  Nicolson sent Pappalardo a bank card and deposited enough money for Pappalardo to purchase the flight to Australia.  Pappalardo never purchased the ticket.

3. About a month after she returned to the United States, still unsure about the status of her relationship with Nicolson, Pappalardo met with a counselor.   After this meeting, she had an "epiphany" about her relationship with Nicolson and decided that it would never work out.

4. On May 4, 2009, Pappalardo sent Nicolson an email stating that she and S.G.N. would not be returning to Australia.

5.      On May 14, 2009, Pappalardo sought a Protection from Abuse Order through the District Court of Maine.  A temporary protection order was entered that day prohibiting Nicolson from contacting Pappalardo and awarding sole parental rights to Pappalardo.

6.      On May 27, 2009, Nicolson commenced the process for obtaining S.G.N.'s return to Australia pursuant to the Hague Convention by contacting the Australian Central Authority.

7.      The Temporary Order of Protection was served on Nicolson on June 12, 2009.  Nicolson hired an attorney to represent him at the hearing on the Protection Order.  Nicolson was advised not to reveal that he was pursuing the instant Hague Petition to Pappalardo for fear that she could flee with S.G.N.

8.      Nicolson's attorney agreed to a Final Order of Protection that gave full custody of S.G.N. to Pappalardo but allowed him contact with S.G.N. via Skype.  The agreed Final Order of Protection was entered on September 4, 2009.  Nicolson did not mention his pursuit of the instant Petition during the Maine state court protection order proceedings.

9.      Nicolson continued to pursue his Hague Convention Petition through the Australian Central Authority.  He diligently provided the necessary paperwork and obtained the appropriate legal documentation.  He applied for and received funding from the Australian Attorney General to cover the cost of his attorney in the United States and his travel to and from the United States.

**10.** Nicolson's efforts ultimately resulted in the instant Petition being filed in this Court on October 22, 2009.

## II.    CONCLUSIONS OF LAW

Under Article 3 of the Hague Convention, the removal or retention of a child is deemed wrongful where "it is in breach of the rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention" and "at the time of removal or retention those rights were actually exercised . . . or would have been exercised but for the removal or retention."

Petitioner bears the burden to show by a preponderance of the evidence that S.G.N. has been wrongfully retained in Maine. To do this, he must show: (1) that S.G.N.'s habitual residence was Australia at the time of the retention; (2) that he had custody rights over S.G.N. at the time of the retention; and (3) that he was exercising those custody rights.

Article 13 of the Hague Convention sets forth several exceptions to the requirement that a wrongfully retained child be returned to the state of habitual residence. In this case, Papparlardo claims that Nicolson consented to S.G.N.'s removal from Australia and that he later acquiesced to her remaining in the United States.

### A.    Petitioner's Prima Facie Case of Wrongful Retention

The parties do not dispute that, if the Court finds that Australia was S.G.N.'s habitual residence, then Nicolson had custody rights and was exercising those custody rights. Thus, the only issue is whether Australia was S.G.N.'s habitual residence at the time of retention.

A child's "habitual residence" is a mixed question of law and fact and is intended to be a fluid concept to allow for the consideration of the specific facts of each individual case.  The Hague Convention purposely avoided defining "habitual residence" and the First Circuit has not thoroughly addressed the issue.  Thus, there is no clear precedent in this circuit.  However, the majority of circuits have adopted the approach set forth in Mozes v. Mozes, 239 F.3d 1067 (9th Cir. 2001), which focuses on determining the parents' "shared intent" or "settled intent."

The place of birth is not automatically the child's habitual residence. See Delvoye v. Lee, 329 F.3d 330, 334 (3rd Cir. 2003) (holding that a child born in Belgium was nonetheless habitually resident in the United States because the mother "traveled to Belgium to avoid the cost of the birth of the child and intended to live there only temporarily").  Nonetheless, if a child is born where the parents have their habitual residence, the child normally should be regarded as a habitual resident of that country. Holder v. Holder, 392 F.3d 1009, 1018 (9th Cir. 2004); see also E.M. Clive, The Concept of Habitual Residence, 1997 Jurid. Rev. 137, 146; see also Cooper v. Casey (1995) 18 Fam. L.R. 433 (Austl.) ("The habitual residence of the young children of parents who are living together is the same as the habitual residence of the parents themselves and neither parent can change it without the express or tacit consent of the other or an order of the court").

In this case, S.G.N. lived with her parents in their marital home for the first three months of her life.  Although there were difficulties in the marriage, they lived together as a family and shared responsibilities for S.G.N.  Accordingly, the Court finds that Australia was initially the habitual residence of S.G.N.  See Nunez-Escudero v. Tice-

8

Menley, 58 F.3d 374, 379 (8th Cir. 1995) (where the parents were married and living together for a year prior to the birth of the child, that state was the child's habitual residence even though the mother and child left when the child was only two months old).

Because Australia was S.G.N.'s habitual residence, the next issue is whether her habitual residence had shifted to the United States by May 4, 2009.[1]  Because S.G.N. was only three months at the time of her removal from Australia, acclimatization to her surroundings is not a significant consideration.  See Karkkainen v. Kovalchuk, 445 F.3d 280, 296 (3d Cir. 2006) ("Acclimitization is an ineffectual standard by which to judge habitual residence [with very young children] because the child lacks the ability to truly acclimatize to a new environment.").  The intent of the parties is more significant than the amount of time that S.G.N. had spent in either country.  See Whiting v. Krassner, 391 F.3d 540, 548 (3d. Cir. 2004) (when a child lacks capacity to form her own intentions the shared parental intent is even more important).  A parent's intent need not be expressly declared, it can be manifested in actions.  Moses, 230 F.3d at 1076.

Pappalardo contends that the United States was S.G.N.'s habitual residence because she intended for her move to be permanent.  However, the issue is not what Pappalardo intended but what the parents shared as their intent for S.G.N.  As noted in Mozes, "[i]f there is a genuine difference of parental intention then the conclusion must be that there is no settled purpose of intention."  Id. at 1078 n.29 (quoting Clive, supra at

---

[1] Because Nicolson pled this case as one of wrongful retention rather than wrongful removal, the relevant date for purposes of S.G.N.'s habitual residence is May 4, 2009, when Pappalardo unequivocally stated that she did not intend to return to Australia.  See Zuker v. Andrews, No. 98-1622, 1999 WL 525936, *1 n.1 (1st Cir. April 9, 1999) (unpublished) ("Because petitioner alleged wrongful *retention*, not wrongful *removal*, the relevant time for determining 'present shared intent' is February 1997 (date of retention), rather than June 1996 (date of removal).") (emphasis in original).

145).   Thus, the issue is whether the parties shared an intent for S.G.N. to shift her habitual residence from Australia to the United States.

"[T]he first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind."  <u>Mozes</u>, 239 F.3d at 1075.  Having considered all of the evidence, the Court finds that Nicolson did not share an intent to have S.G.N. abandon Australia as her habitual residence.  Nicolson wanted Pappalardo to stay in Australia and work on their relationship.  He agreed to allow her to return to the United States to give her a break from the marriage, but he fully intended for her (and S.G.N.) to return after a few months.  Nicolson believed that Pappalardo shared that intent and that she and S.G.N. would return to Australia in a few months.  Because Australia was established as S.G.N.'s habitual residence and Nicolson never intended for that residence to shift to the United States, the Court concludes that, as of May 4, 2009, Australia was S.G.N.'s habitual residence.

Having found that Australia was S.G.N.'s habitual residence, it is undisputed that Nicolson had custody rights at the time of the retention and that he was exercising those rights.  Thus, Nicolson has met his burden of establishing that S.G.N. was wrongfully retained and the Court is required to order her return unless one of the Article 13 exceptions applies.

### B.    Article 13 Exceptions

.    A respondent opposing the return of a child on the grounds of consent and/or acquiescence must prove that either of these exceptions applies by preponderance of the evidence.  <u>See</u> 42 U.S.C. § 11603(e)(2)(B).  There is no dispute as to whether any of the other Article 13 exceptions applies here.

1.    <u>**Consent**</u>

The consent doctrine involves looking at the petitioner's conduct prior to the contested removal or retention and focuses on the petitioner's intent.  <u>Baxter v. Baxter</u>, 423 F.3d 363, 371 (3d Cir. 2005).  "In examining the consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country.  The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account."  <u>Id.</u>  Thus, the respondent must prove by a preponderance of the evidence that the petitioner "harbored a subjective intent to permit the respondent to remove and retain the child for an indefinite or permanent time period."  <u>Baran v. Beaty</u>, 479 F. Supp. 2d 1257, 1267 (S.D. Ala. 2007) (internal quotation omitted).  While post-removal actions can be helpful in discerning consent, the key is whether the petitioner had consented to the removal prior to its occurrence.  <u>See</u> <u>Gonzalez-Cabellero v. Mena</u>, 251 F.3d at 789, 795 (9th Cir. 2001) (mother's post-removal regrets do not alter her pre-removal consent where parents had jointly decided that child would have a better life in the United States).

The parties focused much of their attention at the evidentiary hearing on the events leading up to Pappalardo and S.G.N.'s departure from Australia.  Pappalardo contends that Nicolson "consented" to the removal because he had to know, based on all of Pappalardo's actions, that she was moving back to the United States permanently.  In support of her argument, Pappalardo points to the fact that she packed up nearly all of her belongings, arranged to have Nicolson sell her car, and had her mother book her and S.G.N. a one-way ticket to the United States.  She asserts that Nicolson told her on a number of occasions that he would not keep her in Australia against her will.  She also

points out that Nicolson signed off on the paperwork allowing S.G.N. to obtain a United States passport.  Papparlardo contends that, based on this evidence, it is clear that Nicolson subjectively intended for S.G.N.'s removal to the United States to be indefinite or permanent.

Nicolson testified that he only signed the passport application after Pappalardo agreed to work on their marriage and not to move home to the United States for at least three months.  Nicolson hoped those three months of seeing a counselor and working on their relationship would resolve their issues.  Pappalardo disputes that she agreed to stay for three months but has admitted that Nicolson signed the papers after she agreed to give the marriage another chance.  Thus, the Court concludes that Nicolson's signing S.G.N.'s passport application does not support the finding that Nicolson consented to S.G.N. moving to the United States indefinitely.

Nor does the fact that Nicolson stated that he would not keep Pappalardo in Australia against her will amount to consent.  To the extent that Nicolson may have been resigned to the fact that there was little he could do to stop Pappalardo if she wanted to move back to the United States, the Court finds that he did not consent, as is necessary to satisfy Article 13 of the Convention.  Consent entails the parents coming to a mutual agreement about where their child should reside and who should care for the child.  For example, in In re Kim, 404 F. Supp. 2d 495 (S.D.N.Y. 2005), the Court found that the petitioner had consented to the child's removal to the United States because the parents had come to an agreement by which the child would move to the United States with the respondent while he attended law school in New York.  In Gonzalez-Caballero v. Mena, 251 F.3d 789 (9th Cir. 2001), the petitioner affirmatively reached out to the respondent to

ask if the child could live with the respondent in the United States because the petitioner could no longer care for the child.  The Court found that the petitioner had consented to the child moving to the United States and could not revoke that consent because she later regretted her decision.  Id. at 794.

There was no such consent in this case.  That Nicolson did not want to keep Pappalardo in Australia against her will is not the same as him agreeing with Pappalardo that S.G.N. would be better off in the United States.  It is clear that Nicolson wanted Pappalardo and S.G.N. to remain in Australia so that they could continue to live as a family.  He recognized that there were problems in their relationship but he wanted to work on it.  Pappalardo, on her own, decided that the United States would be a better place her and S.G.N. to live.  Nicolson was not required to take legal action to prevent her departure in order to avoid "consenting" to the removal.

Nicolson's actions immediately prior to S.G.N.'s removal from Australia support the conclusion that Nicolson did not consent.  When Nicolson was informed by his mother that Papparlado had flatly admitted that she was not planning to return to Australia, he immediately booked a plane ticket to Sydney in order to confront Pappalardo about her plans.  Had he already agreed to Pappalardo taking S.G.N. to the United States indefinitely or permanently, there would have been no need for this trip.

Moreover, the state of the parties' relationship at the time of removal supports Nicolson's contention that he did not consent to indefinite or permanent removal.  It is clear that the parties' marriage was not over when Pappalardo left Australia.  Neither party instituted divorce proceedings before the removal occurred.  Pappalardo testified that she never intended to return to Australia, but she also testified that she told Nicolson

13

while they were in Sydney that she was "open" with regard to the status of their marriage. Nicolson testified that he allowed Pappalardo to take S.G.N. to the United States because he believed that Pappalardo needed a break but that he believed that Pappalardo and S.G.N. would return to Australia in a few months.

After Pappalardo left Australia, the parties kept in regular contact by emailing, sending text messages, and chatting on Skype.  Both parties testified that things were going well with the relationship.  Pappalardo testified that Nicolson was being charming and acting how she had always hoped he would when they got married. Pappalardo took steps to keep her Australian visa application active and put a return plane ticket to Australia on hold.

About a month after Pappalardo left Australia, she went to see a counselor.  After meeting with the counselor, she became more reserved with Nicolson.  She then had an "epiphany" and realized that there was no way she could go forward with the relationship.  On May 4, 2009, Pappalardo sent Nicolson an email telling him that she would not be returning to Australia.  Pappalardo began ignoring Nicolson's phone calls and filed for a protection order in Maine District Court.

Thus, the evidence shows that, at the time of removal, Nicolson did not believe that his marriage was over.  He did not believe that Pappalardo and S.G.N. would reside in the United States indefinitely or permanently.  Because Nicolson did not agree to S.G.N. residing in the United States indefinitely or permanently, he did not consent to her removal and retention.

2.      **Acquiescence**

Pappalardo also contends that Nicolson acquiesced to the removal when he participated in the proceedings in Maine District Court that resulted in the Final Order of Protection.  Pappalardo argues that, because Nicolson consented to the Final Order of Protection which granted him only access rights to S.G.N., and never mentioned the instant Hague Petition during those proceedings, he acquiesced to S.G.N.'s removal and retention in the United States.

"[A]cquiesence under the Convention requires either:  an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written enunciation of rights; or a consistent attitude of acquiescence over a significant period of time."  Friedrich v. Friedrich, 78 F.3d 1060, 1070 (6th Cir. 1996).  Acquiescence is a subjective test that requires the Court to look at the "actual subjective intention of the wronged parent, not the outside world's perception of his intention."  Antunez-Fernandes v. Connors-Fernandes, 259 F. Supp. 2d 800, 813 (N.D. Iowa 2003) (citing Re H and Others, (1997) 2 W.L.R. 563, 573B (England)).

As previously stated in the Court's Order on Motion to Dismiss (Docket # 23), state court custody proceedings are relatively inconsequential to a Court's determination of the merits of a Hague Petition.  The purpose of a Hague Petition is to determine the appropriate jurisdiction for custody proceedings, not to determine the merits of the custody dispute.  Accordingly, it would undermine the purpose of a Hague Convention petition if the petition were barred by a state court custody determination.  See Holder v. Holder, 305 F.3d 854, 865 (9th Cir. 2002); Silverman v. Silverman, 338 F.3d 886, 895 (8th Cir. 2003).

Contrary to Pappalardo's contention, the only way that the state court proceedings would affect Nicolson's Hague Petition is if the state court had already addressed the Hague Petition issues (e.g. habitual residence, custody rights, wrongful retention).  See Yang v. Tsui, 416 F.3d 199, 202-03 (3d Cir. 2005) (federal court may be required to abstain if Hague Convention claims had been previously raised during state court proceedings).  Here, Pappalardo readily admits that she was not aware of the Nicolson's Hague Petition until after the Final Order of Protection had been entered.  Thus, there is no way that the state court addressed the issues relevant to the Hague Petition and the state court custody decision has no effect on this proceeding.  See Rigby v. Damant, 486 F. Supp. 2d 222, 227 (D. Mass. 2007) ("Even if the state court made a custody determination before this court issued a judgment, that ruling would not bind this court.")

Pappalardo testified that Nicolson attempted to negotiate an agreement by which he would drop his Hague Petition if Pappalardo would agree to never seek child support or spousal support from him.  Pappalardo argues that these actions show that Nicolson acquiesced to the removal.

Pappalardo contends that Nicolson acquiesced because he only asked that he be allowed to see S.G.N. via Skype and did not seek custody of S.G.N. during the protection order proceedings.  However, his failure to seek custody during the state court protection order proceedings does not waive his right to pursue the instant Petition.  It is common for the removing parent to seek a custody order in the state to which the child has been removed.  See Holder, 305 F.3d at 865.  Upon being served with notice of the protection order proceedings in the Maine District Court, Nicolson was left in a quandary.  He was pursuing this Hague Convention action through the Australian Central Authority but it

was not yet at the point where the instant Petition could be filed.  Pappalardo was effectively denying him access to S.G.N. by avoiding all contact with him.  His participation in the Maine District Court proceedings resulted in him obtaining greater access to S.G.N. than he was previously allowed.  His participation in the state court action cannot be held against him in the instant proceeding.  "To hold that a left-behind parent is barred . . . from raising a Hague Convention claim in a subsequent federal proceeding just because he did not raise it in the state custody proceeding would render the Convention an incompetent remedy for the very problem that it was ratified to address."  Id.

Pappalardo also contends that Nicolson acquiesced to S.G.N.'s retention in the United States because he attempted to negotiate an agreement by which he would abandon his Hague Petition if she would not seek child or spousal support from him.  The general rule is that negotiation should not be translated into acquiescence.  See Bocquet v. Ouized, 225 F. Supp. 2d 1337, 1350-51 (S.D. Fla. 2002) ("the fact that the parties were attempting to establish an agreement as to [the child's] future does not establish . . . acquiescence.").  It is significant to note that Nicolson did not sign the proposed agreement that would require him to drop his Hague Petition.  These informal efforts at coming to a resolution regarding custody do not constitute acquiescence to the removal.  See Koc v. Koc, 181 F. Supp. 2d 136, 150-51 (E.D.N.Y. 2001) ("Petitioner's efforts to obtain voluntary visitation rights prior to filing this petition do not constitute 'acquiescence' under the Convention.")

When courts have found acquiescence, there has typically been a clear pattern of behavior on the part of the petitioner indicating a lack of interest in the child and/or in

obtaining the return of the child.  Where, as here, the Petition for Return is filed relatively quickly and pursued vigorously, courts have routinely found that there was no acquiescence.  See, e.g., In re Leslie, 377 F. Supp. 2d 1232, 1247 (S.D. Fla. 2005) (petitioner's relentless pursuit of legal channels in two countries is inconsistent with acquiescence); Bocquet v. Ouzid, 225 F. Supp. 2d at 1351 (where petitioner fought consistently to have child returned there was no acquiescence).

Ultimately, the fact that Nicolson participated in the Maine state court proceedings and agreed to the Final Order of Protection is immaterial.  He filed the instant Petition soon after Pappalardo notified him that she was not intending to return to Australia with S.G.N. and has diligently pursued the Petition since it was filed. Accordingly, the Court finds that Pappalardo has failed to meet her burden of showing that Nicolson acquiesced to S.G.N.'s removal to and retention in the United States. Nicolson having established that S.G.N. was wrongfully removed and retained in the United States, and Pappalardo failing to establish any of the Article 13 exceptions, the Court is required to order her return to Australia.

### C.   ATTORNEY'S FEES AND OTHER EXPENSES

Pursuant to Article 26 of the Hague Convention and 42 U.S.C. § 11607(b)(3), the Court "shall order the [R]espondent to pay necessary expenses incurred by or on behalf of the [P]etitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate." 42 U.S.C. § 11607(b)(3).  In order to comply with this provision of ICARA, Petitioner

shall file an itemized bill of said costs within 14 days of this Order.  Respondent may file any objections to Petitioner's itemized bill of costs within 14 days thereafter.

## III.    CONCLUSION

The Court hereby GRANTS the Petition for Return (Docket # 1) subject to the following undertakings:

1.    Pappalardo is ORDERED to return S.G.N. to Australia at her own expense not later than February 25, 2010.  Pappalardo shall keep Nicolson informed of her travel plans with respect to S.G.N.'s return.

2.    If Pappalardo chooses to remain in Australia, she shall have full custody of S.G.N. until a custody determination is made by a court of competent jurisdiction in Australia.  If Pappalardo chooses to return to the United States prior to the determination of custody by the court in Australia, Nicolson shall have full custody of S.G.N. in Australia.

3.    The parties shall seek a determination as soon as possible from a court of competent jurisdiction in Australia regarding the custody, support, and visitation with respect to S.G.N.  The Court assumes that the parties can cooperate on visitation and access to S.G.N. until her return to Australia.

4.    Pappalardo shall not remove S.G.N. from the District of Maine pending her return to Australia, absent prior approval by this Court.

5.    Pappalardo and S.G.N.'s passports may be released to Pappalardo solely for the purpose of travel to Australia.

6.    The Court will welcome amendments to these undertakings upon mutual agreement by the parties.

7.      Nothing in this Order shall prevent the relevant courts in Australia from making an independent determination with respect to the custody of S.G.N.

SO ORDERED.

  /s/ George Z. Singal                            
United States District Judge

Dated at Portland, Maine, this 28th day of December 2009.